# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | James B. Moran | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 01 C 7865 | **DATE** | 2/25/2004 |
| **CASE TITLE** | RUBY REED vs. CITY OF CHICAGO | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

MEMORANDUM OPINION AND ORDER

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]
(2) ☐ Brief in support of motion due _____.
(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.
(4) ☐ Ruling/Hearing on _____ set for _____ at _____.
(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(7) ☐ Trial[set for/re-set for] on _____ at _____.
(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.
(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
    ☐ FRCP4(m)   ☐ Local Rule 41.1   ☐ FRCP41(a)(1)   ☐ FRCP41(a)(2).
(10) ■ [Other docket entry] Enter Memorandum Opinion And Order. Medline's motion for summary judgment is denied.

(11) ■ [For further detail see order attached to the original minute order.]

| | No notices required, advised in open court. | | | |
|---|---|---|---|---|
| | No notices required. | | number of notices | Document Number |
| | Notices mailed by judge's staff. | | FEB 26 2004 | |
| | Notified counsel by telephone. | | date docketed | |
| ✓ | Docketing to mail notices. | | docketing deputy initials | |
| | Mail AO 450 form. | | | |
| | Copy to judge/magistrate judge. | | | |
| LG courtroom deputy's initials | | Date/time received in central Clerk's Office | mailing deputy initials | |

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

RUBY REED, Special Administrator of the )
Estate of J. C. REED, Deceased. )
)
              Plaintiff, )
)
    vs. )    No. 01 C 7865
)
CITY OF CHICAGO, a municipal corporation, )
et al., )
)
            Defendants. )

DOCKETED
FEB 2 6 2004

## MEMORANDUM OPINION AND ORDER

Plaintiff Ruby Reed brought suit against the City of Chicago, various Chicago police officers, and several sellers and manufacturers of isolation gowns, including Medline Industries, Inc. (Medline) and Thai Hospital Products Company, Ltd. (Thai Hospital), for claims arising out of the suicide of her son, J.C. Reed (Reed). Plaintiff alleges violation of 42 U.S.C. § 1983, negligence and willful and wanton conduct against the City and its officers. She also alleges strict product liability, negligence, and breach of warranty against the sellers and manufacturers of the gowns. Medline moves for summary judgment on all three counts against it. For the following reasons, Medline's motion is denied.

On the morning of November 12, 2000, Chicago police officers arrested Reed in connection with a domestic disturbance. While detained at a police station Reed informed officers that he was going to kill himself. As a result, the officers placed Reed on suicide watch; they took away his clothes and gave him an isolation gown to wear. Soon after, Reed used the gown to hang himself in his cell.

The gown given to Reed was yellow and had a tag which read:



> Isolation Gown
> 100% Polypropylene
> Made In Thailand

The police station receives its isolation gowns from the Chicago Police Department's central detention facility. Central detention receives the gowns from the department's equipment and supplies office, which orders them from an outside supplier.

Medline argues that it is entitled to summary judgment because the record fails to support a finding that it sold the gown which Reed used to kill himself. Plaintiff responds that the record creates a question of fact regarding the seller of the gown. Our function in ruling on a motion for summary judgment is merely to determine if there is a genuine issue of material fact for trial. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986). Only if the evidence on file shows that no such issue exists and that the moving party is entitled to judgment as a matter of law will we grant the motion. Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Bennett v. Roberts, 295 F.3d 687, 694 (7th Cir. 2002). A plaintiff need not prove her case in a response to a motion for summary judgment; however, she must submit facts in support of her claim. Sutton v. Washington Rubber Parts & Supply Co., 176 Ill.App.3d 85, 88, 530 N.E.2d 1055, 1057 (1st Dist. 1988). Thus, for plaintiff's claims against Medline, she must provide evidence that Medline sold the isolation gown used by Reed. Plaintiff can rely on circumstantial evidence to support her claim, but the circumstances must establish a probability that Medline was the seller, not just a mere possibility. *See id.* Plaintiff has produced evidence such that a reasonable jury could find that Medline sold the gown in question.

Plaintiff has provided evidence that Medline was the Chicago Police Department's only supplier of isolation gowns from March 16, 1996, until November 13, 1998. After receiving its

November 1998 shipment of isolation gowns, the police department did not receive any more until May 13, 2000, when 450 gowns arrived from a different company, Edwards Medical Supply (Edwards). Before Reed's death, the police department received one other shipment of isolation gowns from Edwards on October 2, 2000. Siddiqa Khan, the police department's procurement officer responsible for ordering isolation gowns, stated that no other supplier provided gowns during this time.

The gown at issue had a label that stated it was made in Thailand. Medline admits that some of the gowns it sold in 1996, 1997, and 1998 were made in Thailand by Thai Hospital. Edwards and its supplier, Cyprus Medical Suppliers, Ltd., state that all of their isolation gowns were made in China or Taiwan and none was made in Thailand. Thus, of the two suppliers who sold gowns to the Chicago Police Department during the four years prior to Reed's suicide, only Medline sold gowns made in Thailand.

Plaintiff also provides evidence that the length, width, and arm hole openings of Reed's isolation gown fell within the specifications for gowns sold by Medline. Richard Maddieux, president of Medline's Disposamed Division, inspected Reed's gown on November 4, 2002, at the Chicago Police Department's storage facility, and again at his deposition on December 3, 2003. Discrepancies appeared between Maddieux's two sets of measurements. While plaintiff argues that the inconsistent measurements could evidence Maddieux's fabrication of the original figures, Medline maintains that the discrepancies resulted from different conditions during the two inspections. Regardless, Medline concedes that the conditions under which Maddieux obtained his first set of measurements, which he provided in his affidavit and on which Medline's original motion relied, were "sub-optimal." Medline recognizes that the measurements taken during Maddieux's deposition, when he could handle the gown freely, are

more accurate. The measurements of the length and width of Reed's gown, taken during Maddieux's deposition, fell within Medline's specifications for gowns sold from March 29, 1996 through November 13, 1998. Plaintiff provides evidence that the armhole opening is also consistent with Medline's specifications, at least from 1996 until March 24, 1998.

Finally, the record contains evidence that Medline sold gowns that had the same label as the one found in Reed's gown. On August 20, 1997, while inspecting isolation gowns produced by Thai Hospital, Michael Clayton, Medline's product inspector in Thailand, wrote on an inspection form that the gowns had tags which read:

> Isolation Gown
> 100% Polypropylene
> Made in Thailand

Medline argues that the gowns with these tags were rejected. However, two other records may provide contrary evidence. On another isolation gown inspection form dated November 10, 1997, Clayton identified the following defect: "Product has no size tag; only material, description and country of origin . . . ." According to the form, this defect affected 520 cases of lot number 4500193717. A deviation report completed the next day identifies the same lot of isolation gowns and states, "Accept Iso gowns with no Prod. ID tag in them." Medline asserts that this shows that only gowns without *any* tag were accepted by the company. However, a footnote in Medline's reply undercuts this argument. The footnote states that the term "product ID tag" is interchangeable with "size tag." Thus, the deviation report could be interpreted as an acceptance of all of the isolation gowns, which had "no size tags", as Clayton states, but did identify "material, description and country of origin."

Medline argues that there is no genuine issue of material fact regarding whether it sold Reed's gown because the weight and material composition of his gown does not correspond

to that of Medline gowns. Maddieux stated at his deposition that Reed's gown was made of one-ply spunbond polypropylene material weighing approximately 25 to 28 grams per square meter, while Medline's gowns are made from two bonded plies of spunbond polypropylene material, each weighing 15 grams per square meter. Thus, Medline contends that neither the weight nor the material composition of Reed's gown support plaintiff's claim that it was sold by Medline. Medline admits that Maddieux never inspected the gowns shipped from Thailand from 1996 to 1998. Maddieux asserts that Clayton, Medline's onsite inspector, ensured that 30 grams per square meter spunbond polypropylene was used by Thai Hospital. Clayton did not however weigh the gowns as part of his inspection. While Maddieux's assertions regarding the gowns' differences in weight support Medline's argument that it did not sell the gown, it does not prove plaintiff's evidence to be mere speculation or conjecture.

Nor does Medline's assertion that it did not sell gowns made from one-ply spunbond polypropylene foreclose plaintiff's claim. Medline cites a number of documents from 1996 to 1998, which specify that its isolation gowns are to be made of "30 gram/square meter spunbond polypropylene." However, none of these documents states that this material must be made of two plies of 15 gram per square meter spunbond polypropylene. Maddieux admits that none of Medline's specifications mandate whether the company must use one-ply or two-ply material – they only mandate the material's weight (plf's exh. A, Maddieux's dep., p.132). Nonetheless, Maddieux states that the manufacturers of Medline gowns were required to buy 30 gram per square meter two-ply spunbond polypropylene material from certain suppliers when making Medline gowns. Medline does not point to any additional evidence to support Maddieux's statement. Nor does Medline provide any evidence that its product inspector ensured that isolation gowns manufactured in Thailand were only made from two-ply

spunbond polypropylene, not one-ply spunbond polypropylene. As with the discrepancy in weight, Maddieux's testimony regarding the difference between one-ply and two-ply gowns supports Medline's argument, but it does not eliminate a question of fact.

Nor does the timing of Reed's suicide – two years after the Chicago Police Department's final purchase of Medline gowns – justify summary judgment for Medline. Given that the police department did not purchase any new isolation gowns for eighteen months after receiving Medline's last shipment, and that the gowns went from equipment and supplies to central detention before distribution to the police stations, it would not be unreasonable to find that individual police stations still had Medline gowns at the time of Reed's death.

## CONCLUSION

For the foregoing reasons Medline's motion for summary judgment is denied.

JAMES B. MORAN
Senior Judge, U. S. District Court

Feb. 25, 2004.