IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

RUBY REED, Special Administrator of  )
the Estate of J. C. Reed, Deceased,   )
                                       )
                 Plaintiff,            )
                                       )
         vs.                           )   No. 01 C 7865
                                       )
CITY OF CHICAGO, a municipal           )
corporation, et al.,                   )
                                       )
                 Defendants.           )

## MEMORANDUM OPINION AND ORDER

Plaintiff Ruby Reed brought suit against the City of Chicago, various Chicago police officers, and several sellers and manufacturers of isolation gowns, including defendant Medline Industries, Inc. ("Medline"), for claims arising out of the suicide of her son, J.C. Reed ("Reed"). According to the complaint, upon Reed's arrest, Reed informed the detention facility officers that he was going to kill himself. The officers placed Reed on suicide watch, took away his clothes, and replaced them with a yellow isolation gown. Thereafter, Reed used the gown to hang himself. With respect to Medline, plaintiff's third amended complaint asserts claims of strict products liability, negligence, and breach of warranty. More than two years ago we denied Medline's first motion for summary judgment, finding that the record did not support a finding that, as a matter of law, Medline could not have sold the City of Chicago the gown with which Reed used to hang himself. After more than four years of discovery, Medline brings this second attempt at summary judgment with respect to all counts against it. For the reasons stated herein, we grant Medline's motion for summary judgment.

## BACKGROUND

The following factual background is based on statements submitted by the parties pursuant to Local Rule 56, and for purposes of the summary judgment motion we construe the facts in plaintiff's favor. *See* Adickes v. S.H. Kress & Co., 398 U.S. 144, 157 (1970); Bledsoe v. City of Chicago, 1996 WL 406647, *2 (N.D.Ill.1996) (stating that only reasonable inferences, not all conceivable inferences, will be drawn in favor of the non-moving party).

On November 12, 2000, Reed was placed under arrest by City of Chicago police officers in connection with a domestic disturbance. He was brought to the 5th District lockup, at 727 E. 111th Street, Chicago, Illinois, and charged with criminal damage to property. Reed was distraught and told the officers that he was going to kill himself. Thereafter, Reed was placed on "suicide watch," had his clothing removed, and was provided with a yellow isolation gown. After two hours, Reed was found hanging by the neck in his cell, using the isolation gown as a noose. Reed's suicide attempt ultimately led to his death.

Plaintiff asserts that the isolation gown was utilized as a suicide prevention device, and therefore should have been designed to break or tear away should a detainee attempt to commit suicide by fashioning the gown into a noose. Plaintiff's complaint asserts that "such gowns were specifically designed, marketed, manufactured and/or sold to break away or tear away or give way in the event a person attempted to use the gown to hang himself" (3rd am. cplt., ¶ 44). Plaintiff asserts that, at the least, Medline should have foreseen that police personnel would supply the gown to suicidal detainees, and that the gown was unreasonably dangerous for such a foreseeable use. Plaintiff asserts liability under the theories of strict liability, negligence, and breach of express and implied warranties.

Medline seeks summary judgment on all counts. Primarily, Medline argues that as a

matter of law the use of a gown as a suicide prevention device or as a means to commit suicide, was unforeseeable. Medline asserts that the record is clear that it never marketed, advertised or promoted its gowns as suicide prevention devices; that, in fact, the gowns were designed as fluid repellent gowns to protect caregivers from bodily fluid splash. Medline further asserts that the subject gown was not defective for its intended uses, and that it made no implied or express warranties as to the use of the yellow isolation gowns in the prevention of suicide.

## DISCUSSION

Under FED.R.CIV.P. 56(c), summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *See also* In re Copper Antitrust Litigation, 436 F.3d 782, 788 (7th Cir.2006). In a motion for summary judgment, the moving party has the burden to establish the lack of a genuine issue of material fact. Rozskowiak v. Village of Arlington Heights, 415 F.3d 608, 612 (7th Cir.2005). Upon meeting that burden, the non-moving party must set forth specific facts which demonstrate the existence of a genuine issue for trial. *Id.* The mere existence of some factual dispute will not frustrate an otherwise proper motion for summary judgment; only a genuine dispute over a material fact will defeat summary judgment. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-248 (1986).

For plaintiff to prove a strict products liability claim in Illinois, she must show that Reed's injury resulted from a condition of the gown, that the condition was unreasonably dangerous, and that the condition existed at the time the gown left Medline's control. *See* Sanchez v. Firestone Tire & Rubber Co., 604 N.E.2d 948, 949 (Ill.App.Ct.1992). While circumstantial evidence can be submitted to prove a defect, liability "cannot be based on mere

speculation, guess, or conjecture, and the circumstances shown must justify an inference of probability as distinguished from mere possibility." *Id.*, at 949-50. The occurrence of an injury, without more, is insufficient to prove a product defect. American Family Ins. Co. v. Village Pontiac-GMC, Inc., 585 N.E.2d 1115, 1119 (Ill.App.Ct.1992); Schultz v. Hennessy Indust., Inc., 584 N.E.2d 235, 241 (Ill.App.Ct.1991).

"A product is defective if it is dangerous because it fails to perform in the manner to be expected in light of its nature and intended function." Knapp v. Hertz Corp., 375 N.E.2d 1349, 1353 (Ill.App.Ct.1978). Medline argues that its gown was not defective in light of its intended function. It further argues that the Chicago Police Department's use of the subject gown as a suicide prevention device was neither an intended nor foreseeable use of the product, and therefore precludes liability. Medline is correct that such misuse of a product may defeat a strict liability cause of action. King v. American Food Equipment Co., 513 N.E.2d 958, 965 (Ill.App.Ct.1987).[1] Although plaintiff's third amended complaint contends that Medline's gowns "were specifically designed, marketed, manufactured and/or sold to break away or tear away or give way in the event a person attempted to use the gown to hang himself" (cplt, ¶ 44), plaintiffs have produced no evidence that Medline's gowns were intended for use as suicide prevention devices. Medline, on the other hand, has produced extensive evidence that the gowns were not intended for such use. (*See* def's mo. for sum. jdgmt, exh. C,

---

[1] Citing Illinois' adoption of a comparative fault regime in tort law, plaintiff briefly argues that misuse will only limit recovery, not bar liability (plf's response at 3) (*citing* Welge v. Planters Lifesavers Co., 17 F.3d 209, 211 (7th Cir.1994)). A misuse argument can be applied to bar or limit recovery either by establishing that the product was not defective or that defendant's conduct was not the proximate cause of plaintiff's injuries. Knapp, 375 N.E.2d at 1354. Defendant's misuse argument goes to the former; plaintiff's responsive argument goes to the latter. For purposes of establishing that a product is defective, comparative fault will not preclude the granting of summary judgment.

at 52; exh. D; plf's resp., exh. 13, at 82, 14; exh. 17, at 52, 59).[2] Rather, Medline's gowns were intended for use as fluid repellent gowns to assist in the prevention of contamination (*see* plf's resp., exh. 13, at 82, 88; exh. 17, at 59).

Liability may still attach, however, if suicide prevention was a reasonably foreseeable use of Medline's isolation gowns. Knapp, 375 N.E.2d at 1353; Kerns v. Engelke, 390 N.E.2d 859, 864 (Ill.1979). Foreseeability and defect are generally questions for the jury. Korando v. Uniroyal Goodrich Tire Co., 637 N.E.2d 1020, 1024 (Ill.1994); Winnett v. Winnett, 310 N.E.2d 1, 5 (Ill.1974); Dunham v. Vaughan & Bushnell Mfg. Co., 229 N.E.2d 684, 691 (Ill.App.Ct.1967). Where, however, taking all facts in the light most favorable to plaintiff, a reasonable jury could not issue a finding of foreseeability, summary judgment is appropriate. *See* Malone v. BIC Corp., 789 F.Supp. 939, 941 (N.D.Ill.1992); Volpe v. IKO Indust., Ltd., 763 N.E.2d 870, 878-79 (Ill.App.Ct.2002); Schierer v. Sears Roebuck and Co., 400 N.E.2d 1072 (Ill.App.Ct.1980).

Defendant argues that use of the subject gown as a suicide prevention device was unforeseeable as a matter of law. Plaintiff, not surprisingly, vehemently disagrees. Plaintiff's primary argument is that a product use is foreseeable if the product is regularly and customarily used in such a manner. Plaintiff is correct in theory. *See* Kerns, 390 N.E.2d 859 (finding that it was local custom to "wire up" a blower on a tractor in order to move the tractor, and therefore, injury resulting from such "wiring up" was reasonably foreseeable); Palmer v. Avco Distributing Corp., 412 N.E.2d 959, 962 (Ill.1980) (finding sufficient evidence

---

[2] Plaintiff includes in her exhibits Medline's Health Care Supply Catalog. (plf's resp;, exh. 16). Nowhere in the catalog does Medline indicate that suicide prevention was one use of the isolation gowns, or that the gowns would easily tear or break away. In fact, the catalog describes the gown at issue (catalog #NON24236), as a "sewn gown," as compared to a seemingly less stress-resistant "gown with glued seams" (catalog #NON24427).

from which a jury could infer that people, including children, customarily rode in fertilizer spreaders, making an injury from the agitator below the spreader reasonably foreseeable).

As Medline notes, however, such cases are readily distinguishable from the case at hand. In <u>Kerns</u>, plaintiff's expert and the defendant retailer confirmed the local custom of tying the loose end of the assembly to the blower. In <u>Palmer</u>, three farmers and an expert testified to the custom of riding in fertilizer spreaders. No such testimony exists in the case before us. Plaintiff's expert's report has been struck from the record (<u>Reed v. City of Chicago</u>, 2006 WL 1543928 (N.D.Ill.2006)) and neither the City of Chicago nor other users of the subject gown have testified to a custom of using the gown as a suicide prevention device. In fact, the only testimonial evidence from City employees states the opposite – that there was no policy or custom of using the yellow isolation gowns as suicide prevention devices (*see* plf's resp., exh. 2, ¶ 43; exh. 3, ¶ 43).

Plaintiff primarily points to three pieces of evidence to suggest that the use of the isolation gowns was customary practice. First, plaintiff submits the Chicago Police Department's Patrol Division Special Order 90-1, which states that "interim clothing," including a "yellow 'paper poncho' will be provided for a prisoner detained in a lockup facility" (plf's resp., exh. 1, at 000403). Second, plaintiff submits defendant Pemberton's deposition testimony, in which he refers to the subject isolation gown as a "paper suit" and indicates that "paper suit" is a "customary term that's used at lockup" (plf's resp., exh. 7, 47-48). Finally, plaintiff submits Reports of Extraordinary or Unusual Occurrences (REUOs), documenting suicide attempts in all CPD lockups for over 16 years prior to the occurrence.[3]

---

[3] Along with 28 instances of use or suggested use of "paper suits," plaintiff also includes hundreds of reports of hanging attempts whereby detainees have used various items of clothing as ligature. The purpose of such a submission is unclear. Although it is reasonably foreseeable that a suicidal person would have

The REUOs suggest that on multiple occasions, "paper suits" (also called "yellow paper suits," "paper jumpsuits," or "paper gowns") had been provided to suicidal or dangerous detainees, and in four situations such paper suits had been used by detainees as ligature in suicide attempts (*see* plf's resp., exh. 10, at U00031, U00033, U00087, U00202). Additionally, in many REUOs where detainees had used other pieces of clothing for suicide attempts, the reporting officer suggested that paper suits be given to detainees to prevent the use of clothing for suicide attempts. Plaintiff suggests that, taken together, this evidence establishes that the City of Chicago had a custom of using the subject yellow isolation gowns for suicide prevention.

Plaintiff's submitted evidence is insufficient to establish a custom or practice of using Medline's isolation gowns as suicide prevention devices. Special Order 90-1 is an internal document, and all evidence submitted suggests that Medline was completely unaware of such an order (plf's resp., exh. 22, at 56-57; exh. 14, at 78). Additionally, nowhere in Special Order 90-1 does the City suggest that the yellow paper poncho is intended for suicide prevention. Rather, although the order states that "[c]lothing not potentially hazardous to a person's well being will be provided by the Department" (plf's response, exh. 1, at 000403), it is consistent with Medline's contention that the isolation gowns were used for temporary clothing when a detainee was in need of clothing. (Def's motion, exhs. F, G, H, I, at ¶ 1). Pemberton's testimony, standing alone, does not establish that the Chicago Police Department used isolation gowns for suicide prevention.[4] Finally, the REUOs–also internal documents–provide

---

access to such items of clothing, plaintiff makes no suggestion that those manufacturers should be liable for such a tragedy. Therefore, plaintiff's inclusion of those REUOs is irrelevant at best, and may actually support defendant's argument.

[4] And even if it did, such evidence does not, in itself, establish a foreseeable custom. Plaintiff introduced no collaborating evidence of other police departments, hospitals, or expert witnesses to establish that use of the isolation gowns as suicide prevention devices was a common practice. *Cf.* Kerns, 390 N.E.2d 859; Palmer, 412 N.E.2d 959.

conflicting evidence regarding patterns and practices of use of the gowns for suicide prevention in the City of Chicago lockups. Of the approximately 28 mentions of paper suits in the REUOs, almost half are suggestions for use of paper suits in the future. The fact that the paper suits were not employed, but instead proposed as a future remedy, suggests that giving paper suits to detainees was not a custom or practice of the Chicago Police Department.

Even viewing such evidence in the light most favorable to plaintiff, plaintiff has not produced enough evidence of a custom to create a factual issue for the jury. *See* Kempes v. Dunlop Tire and Rubber Corp., 548 N.E.2d 644, 647-48 (Ill.App.Ct.1989) (plaintiff failed to present evidence that, in light of the general experience within the industry, it was reasonably foreseeable that a child would so alter a golf ball so as to be injured by the bentonite clay paste center); Mata v. Clark Equipment Co., 374 N.E.2d 763, 767 (Ill.App.Ct.1978) (verdict should have been directed in manufacturer's favor where plaintiff failed to produce evidence that defendant could reasonably have foreseen plaintiff's forklift injury); Winnett, 310 N.E.2d at 4-5 (scope of the product's intended use did not include use by a four-year-old child, and therefore, the child's injury was unforeseeable).

Nor has plaintiff produced any evidence that Medline knew that its gown was being used as a suicide prevention device. In fact, plaintiff's argument focuses specifically on what Medline could have known, had any of the employees inquired. Such an inquiry, however, is not required. *See* Mason v. Caterpillar Tractor Co., 487 N.E.2d 1043, 1046 (Ill.App.Ct.1985) (defendant had no knowledge of similar accidents or complaints regarding the composition of its track shoes). Here, plaintiff has failed to submit (1) expert evidence of custom or general practice; (2) corroborating evidence of custom or practice; or (3) Medline's actual knowledge of the use of its isolation gown as a suicide prevention device. As the gown was used outside

of its intended manner, without evidence of custom or practice, we cannot find that Reed's injury was foreseeable. *Cf.* Walker v. Trico Mfg. Co., Inc., 487 F.2d 595, 598 (7th Cir.1973) (defendant president admitted that he had foreseen the possibility of an injury such as plaintiff's and plaintiff was using the product for its intended purpose at the time of injury); Sipari v. Villa Olivia Country Club, 380 N.E.2d 819, 824-25 (Ill.App.Ct.1978) (although plaintiff may have contributed to his injury by driving at full speed, because plaintiff was using the golf cart in its intended use, plaintiff's use was foreseeable). Illinois courts have repeatedly held that manufacturers should not be held to a standard of insurers of their products, guaranteeing against all injuries. Korando, 637 N.E.2d at 1024 ("Strict products liability is not a doctrine of absolute liability; the manufacturer of a product is not an absolute insurer"). *See also* Mata, 374 N.E.2d at 766; Schierer, 400 N.E.2d at 1076; Mason, 487 N.E.2d at 1047; Winnett, 310 N.E.2d at 4. We will not now expand such liability that Illinois courts have so clearly rejected.[5]

Alternatively, a manufacturer may be held strictly liable in tort for failing to warn of a product's dangerous propensities, even if there is no manufacturing or design defect. Schultz, 584 N.E.2d at 242; Dunham, 229 N.E.2d at 688-89. Thus, even if the gown was faultlessly made, Medline may be liable for failing to give adequate warnings of its dangerous propensities. Knapp, 375 N.E.2d at 1353. Such a duty to warn, however, is only imposed if it was "'objectively reasonable' to expect the user of the product to be injured in the manner

---

[5] Medline also points to Gilbertson v. Rolscreen Co., 501 N.E.2d 954 (Ill.App.Ct.1986), as analogous to the case at hand. In that case, the Illinois court directed a verdict in favor of window manufacturer as to a strict liability claim for injuries a psychiatric patient sustained by jumping out of window. The court found that the window was not unreasonably dangerous simply because it broke when kicked and, even if it was, such was not the proximate cause of plaintiff's injuries. Like the case at hand, plaintiff submitted no evidence that defendant had knowledge that it was to design and provide a window with special security features. It is clear that, even had we found an unreasonably dangerous defect, the proximate cause prong of both the strict liability and negligence causes of action would have also posed a problem for plaintiff.

in which the plaintiff was injured. Schultz, 584 N.E.2d at 242; Kempes, 548 N.E.2d 644 at 649. Liability only attaches if the product lacked adequate warnings for a use or danger of which manufacturer knew or should have known. Knapp, 375 N.E.2d at 1353. Because we have already established that suicide prevention was not a foreseeable use of the isolation gowns, Medline did not have a duty to warn of such an unforeseeable danger. Genaust v. Illinois Power Co., 343 N.E.2d 465, 471 (Ill.1976) ("The determination of whether a duty to warn exists is a question of law and not of fact. Underlying such a determination is necessarily the question of foreseeability, which, in the context of determining the existence of a duty, is for the court to resolve"); Mason, 487 N.E.2d at 1048 ("for there to be a duty to warn, it must be 'objectively reasonable' to expect the user of the manufacturer's product to be injured in the manner in which the plaintiff was injured").

In addition to claims of strict liability, plaintiff has asserted a negligence claim against Medline for failing to ensure that the gown would break or tear away, failing to ensure that the materials and manufacturing techniques would render the gown too strong to break or tear away, and carelessly failing to provide adequate warnings of the gown's inability to break or tear away (3d am. cplt, ¶ 53). To prevail on a negligence claim, plaintiff must establish "the existence of a duty, a breach of that duty, and an injury to the plaintiff which is proximately caused by that breach." American Family Ins. Co., 585 N.E.2d at 1119. See also Phillips, 516 N.E.2d at 674; Schultz, 584 N.E.2d at 241.

In products liability actions, many of the concepts of strict liability and negligence overlap. First, "the breach of duty is the same in both a negligence and strict products liability claim." Phillips, 516 N.E.2d at 674. The difference is only in the concept of fault. In a negligence claim, the defendant must have been at fault, and in a strict liability claim,

defendant can be liable regardless of fault. *Id.* Second, similar to a strict liability action, in alleging negligent design and manufacture, plaintiff must prove that the product left the manufacturer's control with a defective condition. Rotzoll v. Overhead Door Corp., 681 N.E.2d 156, 162 (Ill.App.Ct.1997). Finally, plaintiff must establish proximate cause in both strict liability and negligence actions. *See* Schultz, 584 N.E.2d at 241. In our analysis of plaintiff's strict liability claim, we have already concluded that Medline could not have reasonably foreseen the type of injuries Reed sustained. As plaintiff has failed to put forth sufficient evidence to create a controversy over whether the gown was defective or whether Medline owed Reed a duty of care, plaintiff's negligence action must also fail. *See Id.*, at 241-42.

Finally, plaintiff asserts claims of breach of express and implied warranties of merchantability against Medline pursuant to 810 ILCS §§ 5/2-313, 5/2-314, and 5/2-315. Specifically, plaintiff's complaint asserts that Medline "impliedly and expressly warranted that the isolation gown was fit, safe and suitable for the use for which it was intended, and also of merchantable quality, including the warranty that it would tear away, break away or give way in the event a detainee, such as J.C. REED, or another foreseeable user attempted to use the isolation gown to hang himself" (3rd am. cplt, ¶ 60).

To succeed on an express warranty action, "plaintiff must show breach of an affirmation of fact or promise which was made part of the basis of the bargain." Wheeler v. Sunbelt Tool Co., Inc., 537 N.E.2d 1332, 1341. Plaintiff has failed to point to any such express warranty that Medline's isolation gowns would tear away, break away, or give way in the event of a suicide attempt. Nor has plaintiff pointed to an affirmation, promise, description, or sample that the isolation gown was properly intended to be used as a suicide prevention

device.[6] Therefore, plaintiff cannot succeed on a breach of express warranty claim under § 5/2-313. *Cf. Id.*, at 1340 (defendants expressly warranted that the product punch "won't break").

To succeed under § 5/2-314, plaintiff must establish existence of a warranty, breach of that warranty, and proximate cause. *Id.*, at 1341. An implied warranty is such that "a product must conform to affirmations of fact about it on labels or on the container and be fit for the ordinary purpose for which such goods are used." *Id. See also* Trans-Aire Int'l, Inc. v. Northern Adhesive Co., Inc., 882 F.2d 1254, 1257 (7th Cir.1989). We have already established that plaintiff has failed to produce evidence that suicide prevention was an ordinary, or even foreseeable, purpose for which Medline's isolation gowns were to be used. As the theories of breach of implied warranty and strict liability substantially overlap (Alvarez v. American Isuzu Motors, 749 N.E.2d 16, 23, n2 (Ill.App.Ct.2001); Nave v. Rainbo Tire Service, Inc., 462 N.E.2d 620, 625 (Ill.App.Ct.1984)), and we have already foreclosed plaintiff's strict liability claim for lack of foreseeable use, such a finding also precludes plaintiff's breach of implied warranty claim.

Like § 2-314, § 2-315 is an implied warranty statute that guarantees manufacturer's product "for a particular purpose if a seller knows of the buyer's particular purpose for the goods and the buyer relies upon the seller's skills or judgment to select suitable goods." Trans-Aire Int'l. Inc., 882 F.2d at 1257. Plaintiff points to two passages in the 1995 Medline catalog

---

[6] Medline's express warranty states: "Medline warrants that all Medline-manufactured products described in this catalog are manufactured under exact specifications to provide complete customer satisfaction. All products distributed by Medline and contained in this catalog accurately reflect the representations made to Medline by the manufacturers of those products. There are no warranties which extend beyond those of the manufacturer" (plf's resp. exh. 16, at M00805). This is inadequate as an express warranty that the isolation gown would tear or give way in the event it was used as a method of hanging oneself.

in a seeming attempt to state a claim for breach of implied warranty under § 2-315. The first states: "Your Medline representative is a trained professional – prepared to provide you with the level of service you expect to ensure the smooth-working operation of your healthcare facility. Your Medline representative is more than an 'order taker.' Ask him/her about product inservicing – or about anything concerning the products and services Medline provides" (plf's resp, exh. 16, at M00814). The second states: "As a leading manufacturer in the health care industry, Medline manufactures over 10,000 products for all areas of the hospital, including textiles, surgical instruments, custom procedure trays and a wide array of med-surg items. With five U.S. plants, we manufacture 70% of the products we sell. ... And since we control our own manufacturing, we're able to customize products to meet your unique requirements" (*id.*, at M00797). Although Medline suggests that its representatives are skilled in negotiating the use and purpose of its products, plaintiff has submitted no evidence that the City of Chicago or Chicago Police Department relied on such expertise in purchasing the gowns for suicide prevention. In fact, the depositions prove the opposite. The person in charge of ordering the gowns, Ms. Siddiqa Khan, testified that she had no contact with the customer service representatives at Medline outside of giving purchase orders. (*See* plf's response, exh. 4, at 37-38). Additionally, the Medline representatives were never advised that the City or Police Department intended to use the gowns as suicide prevention devices (*see* def's motion, exh. C, at 56; exh. E, at 5). Plaintiff's own statement of facts notes that "Ms. Wander [Assistant Director of Government Accounts] admitted that she could have asked the CPD what they were using the gowns for, but she never did" (plf's stmt. of facts, ¶ 39). Without reliance, plaintiff cannot succeed on a claim of warranty of fitness for a particular purpose. *See* Trans-Aire Int'l, Inc., 882 F.2d at 1257-58.

## CONCLUSION

For the reasons stated above, defendant Medline's motion for summary judgment is granted as to all counts against it.

Oct. 31 ~~_____~~, 2006.

JAMES B. MORAN
Senior Judge, U. S. District Court